**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IVY BRIDGE UNIVERSITY, LLC f/k/a Ivy Bridge College, LLC, a Delaware LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| HIGHER LEARNING COMMISSION, an Illinois corporation, | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**COMPLAINT**

Ivy Bridge University, LLC f/k/a Ivy Bridge College, LLC ("Ivy Bridge") brings this action against Higher Learning Commission ("HLC") alleging that its conduct constitutes (1) intentional interference with contractual relations, and (2) intentional interference with prospective business interests. Ivy Bridge seeks damages.

**OVERVIEW**

In 2007, Plaintiff Ivy Bridge formed an innovative partnership with Tiffin University, a federally accredited Ohio university, to deliver high-quality, transferable online college courses to underprivileged students. This joint venture, known as Ivy Bridge of Tiffin, directly addressed a growing problem in higher education facing many students: burgeoning debt and poor degree completion rates. By 2012, the Ivy Bridge of Tiffin model was working for its students and earning praise for its effectiveness, including from Defendant HLC, a regional accreditor.

Meanwhile, however, HLC had come under harsh criticism for its failure to provide meaningful oversight of the quality of its member schools, particularly in the for-profit education sector. To quiet its critics and maintain its status as a federal accreditor, HLC chose to stifle legitimate educational innovation while remaining lax in its oversight of for-profit member schools. In furtherance of this "worst of both worlds" regulatory scheme, HLC improperly threatened Tiffin's accreditation if it did not end its relationship with Ivy Bridge. Left with no choice, Tiffin ended the Ivy Bridge of Tiffin relationship. As a result, HLC put Ivy Bridge out of business and abruptly terminated an innovative educational opportunity that was effectively serving underprivileged students.

## THE PARTIES

1.      Ivy Bridge is, and was, at all relevant times, a Delaware company with its principal place of business in San Francisco, California.

2.      HLC is an Illinois corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.

4.      This Court has personal jurisdiction over HLC because HLC regularly transacts and conducts business within this State and HLC otherwise has made or established contacts within this State sufficient to permit the exercise of personal jurisdiction.

## VENUE

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because HLC resides in the Northern District of Illinois and/or a substantial part of the events giving rise to Ivy Bridge's claims occurred in the Northern District of Illinois.

## BACKGROUND

**A.     Low Completion And High Cost: American Higher Education Is Broken.**

6.      Less than 60% of students starting at four-year degree institutions graduate within six years.[1]

7.      At community colleges, just 28% of their students earn two-year degrees within three years.[2]

8.      In addition to the poor degree completion rates, community colleges have not functioned well as feeders to four-year institutions.  Transfer rates are low, degree completion rates for transferring students are low, and nearly half of all transfer students lose some or all of their college credit in the process of transferring.

9.      Many community college students are the first in their family to go to college, so they are at a disadvantage in navigating the college system compared to students whose relatives attended college and understand the college system.

10.     Meanwhile, college costs are out of control.  Tuition and fees have outpaced inflation three-fold over the past twenty years,[3] and cumulative outstanding student loan debt is more than a trillion dollars.

---

[1] *See* National Performance Scorecard for 4-year colleges, at:  http://collegemeasures.org/4-year_colleges/national/scorecard/strategic-measures/ (indicating that graduation rate is 59.6%).

[2] *See* Undergraduate Retention and Graduation Rates, at:  https://nces.ed.gov/programs/coe/indicator_ctr.asp.

[3] *See* Twenty Years of Tuition Growth at National Universities, at:  http://www.usnews.com/education/best-colleges/paying-for-college/articles/2015/07/29/chart-see-20-years-of-tuition-growth-at-national-universities.

11.    In other words, not only are our nation's institutions failing to award degrees to a large portion of their students, they are leaving them in massive debt.

12.    These problems with higher education have the most severe impact on low income and minority students.  While college represents their best hope to a higher earning career, they are more likely to come out of it with a lot of debt and no degree.

**B.    Ivy Bridge of Tiffin University: A Solution.**

13.    Ivy Bridge of Tiffin was created to address some of these problems.

14.    In December 2007, Ivy Bridge of Tiffin was formed to offer online associate's degree programs pursuant to a Joint Venture Agreement between Tiffin University ("Tiffin")—a 127-year-old accredited university—and Ivy Bridge College, LLC.

15.    To address the needs of underprivileged students, Ivy Bridge of Tiffin combined the faculty and coursework of Tiffin with the convenience and flexibility of an online environment.  This gave students the flexibility to work part-time or full-time jobs while attending the school.

16.    Once it was up and fully running, Ivy Bridge of Tiffin's time to graduation was roughly half the time of the average community college.

17.    In addition, Ivy Bridge of Tiffin functioned as an effective feeder to four-year colleges.  Its students successfully transferred to more than 200 different four-year institutions.

18.    Ivy Bridge of Tiffin attained this success by, among other things, providing each of its students with mandatory tutors; entering into agreements with different four-year universities that guaranteed its students' acceptance into these universities if they met GPA requirements; and creating proprietary software that allowed its students to easily track the

- 4 -

courses they needed to take and the grades they needed to achieve to be guaranteed acceptance into the four-year university of their choice.

19.     In 2012, in recognition of Ivy Bridge's efforts to make college more accessible and affordable, the Bill and Melinda Gates foundation awarded it with a prestigious Next Generation Learning grant.  Next Generation Learning grants are intended to award innovators demonstrating the vision necessary to transform public education and higher education.

**C.     Accreditation and HLC.**

20.     If an institution is not accredited, its students cannot apply for federal financial aid.

21.     In addition, degrees from unaccredited institutions are viewed as not very useful or worthwhile.  Their programs are widely perceived as low quality, and many employers do not recognize degrees from unaccredited institutions.

22.     For students wishing to transfer to an accredited institution, those schools rarely accept credits or degrees from unaccredited schools.

23.     Thus, accreditation is the "seal of approval" without which a university cannot meaningfully operate.

24.     The federal government does not accredit schools directly.  Instead, the federal government has authorized regional accrediting agencies to develop and apply standards to accredit schools.

25.     HLC is one such accrediting agency.  It has developed five key criteria for accreditation of institutions within its region:  (1) Mission; (2) Integrity:  Ethical and Responsible Conduct; (3) Teaching and Learning:   Quality, Resources, and Support; (4) Teaching and

Learning: Evaluation and Improvement; and (5) Resources, Planning, and Institutional Effectiveness.[4]

26.     Accrediting agencies are required to follow certain rules as set forth by law. For instance, the law requires that an accrediting agency's decisions not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or reached without observance of procedure required by law.

27.     An accrediting agency is also required to follow its own rules. This means an accrediting agency cannot disregard its own rules and refuse to accredit or otherwise interfere with a school simply because it does not like a particular school or does not want that school to be accredited for political reasons.

28.     Tiffin is accredited by HLC. Ivy Bridge has never sought accreditation from or been denied accreditation by HLC or any other accrediting agency.

**D.      HLC Embraces Ivy Bridge.**

29.     In a January 2008 letter, Tiffin specifically notified HLC that it was pursuing a joint venture to offer an online associate's degree, which would be known as Ivy Bridge of Tiffin. HLC expressed support for the joint venture.

30.     In June 2009, in response to HLC's request for information about the joint venture, Tiffin sent another letter to HLC explaining the legal documents that established Ivy Bridge of Tiffin, and assuring HLC that Tiffin remained in exclusive control of the academic aspects and other key aspects of the relationship, such as financial aid.

31.     Around the same time, HLC adopted a policy governing "Change of Control, Structure, or Organization" for its member institutions.

---

[4] *See* Higher Learning Commission, Criteria for Accreditation, at: http://policy.hlcommission.org/Policies/criteria-for-accreditation.html.

32.     In 2010, HLC conducted a "Ten Year Review" of Tiffin, which included a special focus on Ivy Bridge of Tiffin.

33.     The Ten Year Review is a comprehensive evaluation of member institutions conducted by HLC for accredited institutions to confirm that the institutions continue to meet HLC's criteria for accreditation.

34.     HLC's Ten Year Review of Tiffin included a review of materials Tiffin submitted demonstrating compliance with HLC guidelines and federal law, a student opinion survey, and an on-site peer review visit.

35.     In June 2010, while HLC's Ten Year Review of Tiffin was pending, HLC further refined its "Change of Control" policy.

36.     As HLC has acknowledged, the team conducting the review "was aware of the [Ivy Bridge of Tiffin] joint venture" and "made generally favorable statements about it."

37.     However, the team conducting the Ten Year Review of Tiffin did not mention, suggest, or imply that the Ivy Bridge of Tiffin joint venture implicated the Change of Control policy in any way.

38.     In or around August 2010, Ivy Bridge of Tiffin received uniformly positive feedback from the on-site peer review team, including the following:

      a.    The concept of the Ivy Bridge partnership is an excellent strategic initiative. It addresses an underserved population through a strong curriculum, efficient and effective academic support, excellent instruction, and a very good online portal for program delivery.

b.    Ivy Bridge College delivers quality education to a relatively underserved population.  Its staff support concept is innovative and well received by the students.

c.    It is evident that the University is embracing innovation and change with regard to on-line programs and Ivy Bridge entrepreneurship ventures.  The University has stayed true to its mission in these new opportunities.  Its focus on career oriented disciplines such as business and criminal justice is clear evidence of programs that support the mission.

d.    TU [Tiffin University] effectively utilizes strategic alliances/partnerships to develop and grow academic programs and to expand its local, national, and global presence.  These alliances have been particularly effective in the success of the online Associates Degree programs and the International master's and bachelor's degree programs.

e.    Tiffin's Ivy Bridge partnership and its European alliances are clear examples of using external relationships to further the mission of the University and stabilize the financial condition.

39.    On August 18, 2010, the Ten Year Review concluded with HLC formally notifying Tiffin that it had voted to continue Tiffin's accreditation for ten years.

**E.    Pressure Mounts for HLC to "Crack Down" on Non-Traditional Universities.**

40.    In 2010 and 2011, non-traditional universities received significant bad press.

41.    Most of the press focused on situations where a for-profit business purchased a struggling traditional university to turn it into a money-making enterprise with little or no regard for the educational outcomes of students.

42. Notably, the public-private partnership between Tiffin and Ivy Bridge was markedly different from the for-profit colleges criticized by the media because Tiffin, a non-profit institution with a long history of serving its students, maintained control of the program's academics to ensure quality and positive student outcomes.

43. In contrast, the negative media coverage focused almost exclusively on for-profit colleges. One media target was Bridgepoint Education, Inc. ("Bridgepoint"), a for-profit company that purchased two small, accredited universities that were on the brink of bankruptcy.

44. After the purchase by Bridgepoint, enrollment in the two universities skyrocketed from a few hundred students to more than 70,000, the vast majority of whom were online students.

45. With this business model, Bridgepoint reaped hundreds of millions of dollars in profit, mostly from federal funds. However, the academic results of its students were not so impressive. In fact, the majority of its students failed to complete their programs.

46. Between June 2010 and July 2012, the United States Senate conducted an in-depth investigation into for-profit higher education, including Bridgepoint.

47. The Senate took HLC to task for the perception that HLC was lax in accrediting (or declining to accredit) for-profit institutions.

48. The Senate expressed concern that the "dismal outcomes" for students of for-profit colleges like Bridgepoint didn't trouble their executives, who instead were "basking in the applause of Wall Street."

49. Ashford University, one of the two institutions purchased by Bridgepoint, was accredited by HLC.

50. The Senate's investigation included six congressional hearings led by Senator Tom Harkin, Chairman of the Senate Committee on Health, Education, Labor and Pensions.

51. Because of HLC's role in accrediting Bridgepoint, HLC's President, Sylvia Manning, was called to testify before the Senate in March 2011.

52. At the hearing, the Senate grilled Manning about HLC's ability to provide meaningful oversight of for-profit colleges and distance learning programs.

**F.      HLC Identifies A Sacrificial Lamb.**

53. Manning left the hearings under pressure from the Senate to show that HLC was up to the task of regulating non-traditional colleges.

54. HLC had already accredited many of the for-profit universities that sprung from the failing traditional schools, and it could not simply revoke that accreditation without fueling the perception that it had previously been lax in its oversight of those institutions.  Thus, HLC had to find the right target to show that it could "get tough."

55. Ivy Bridge's unusual partnership with Tiffin made it an easy target because HLC could make Ivy Bridge an example by threatening Tiffin's accreditation.

56. Of course, the Ivy Bridge of Tiffin model was totally different than the model that formed the basis of the Senate investigation, but that did not matter to HLC.

57. HLC chose to provide the "worst of both worlds" as a regulator by remaining lax in its oversight of the major for-profit institutions while stifling legitimate innovators like Ivy Bridge under the guise of cracking down on non-traditional colleges.

58. In December 2011, Tiffin's President, Dr. Paul Marion, advised HLC that Ivy Bridge ultimately planned to seek independent accreditation from the Western Association of Schools and Colleges.  Dr. Marion added that Ivy Bridge had not yet submitted an initial application to the regional accrediting agency, but wanted to keep HLC informed of its plans.

59.    In February 2012, Sylvia Manning sent Tiffin a letter suggesting that the Ivy Bridge joint venture agreement, disclosed to HLC back in 2008, as well as the plan for Ivy Bridge to seek independent accreditation, required HLC approval for a "change of control."

60.    The letter claimed that HLC had "no record" of Tiffin seeking approval for the joint venture, but acknowledged that "the last comprehensive evaluation team was aware of a relationship."

61.    Manning suggested that Tiffin was impermissibly "outsourcing" its academic programs to an unaccredited entity and demanded that Tiffin provide detailed information regarding Ivy Bridge of Tiffin within 14 days for a change of control review.

62.    Over the next several months, even though they disagreed that any "change of control" had occurred, Ivy Bridge and Tiffin complied with HLC's requests while noting that HLC had been kept fully aware of Ivy Bridge of Tiffin, its structure, its operations, and the relationship between Ivy Bridge and Tiffin throughout the previous four years.

63.    The change in control review process included an "on site" visit and inspection, which occurred in March 2013.

64.    HLC brought only four inspectors to the on-site visit: two members of HLC and two others, none of whom had any experience with or knowledge of public-private education joint ventures, or even community colleges.

65.    After a two-day visit, the inspectors met with representatives from Ivy Bridge and Tiffin.  They expressed some minor concerns about the review, which they indicated were typical for any "change of control," but they did not identify any serious issues or indicate that Tiffin's accreditation was in jeopardy in any respect.

**G.      The Senate Issues Its Final Report Regarding For-Profit Colleges.**

66.      On July 30, 2012, the Senate released a final report criticizing HLC and other accreditors for their lack of meaningful oversight of program quality and student outcomes at their member institutions.[5]

67.      The Senate's report noted that, even though accreditors "serve as *de facto* gatekeepers for billions of dollars of Federal education benefits each year," they have not "placed much weight on student outcomes like retention and student loan default."[6]

68.      The Senate's report further observed that accrediting agencies were "overwhelmed by the rapid growth of non-traditional educational organizations" and "not equipped to properly oversee" them.[7]

**H.      HLC Forces Tiffin to "Cut Ties" with Ivy Bridge.**

69.      On May 31, 2013, HLC sent a letter to Dr. Marion, enclosing a summary report from the change of control review, which, according to HLC, raised "significant issues regarding [Ivy Bridge of Tiffin], its quality and the oversight of it exercised by Tiffin."

70.      The letter closed with a warning:  "With so many issues, it is likely that the Board will be considering denial."

71.      Unlike prior evaluations, the May 2013 summary report was extremely critical of Ivy Bridge of Tiffin.  The report criticized Tiffin's oversight of the program as well as the content of its online courses.  It also accused Tiffin of violating HLC policies and Department of Education regulations.

---

[5] The report included profiles of thirty for-profit colleges, but Ivy Bridge was not among them.
[6] *See* United States Senate Health, Education, Labor and Pensions Committee Report, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, at 122, available at: http://www.help.senate.gov/imo/media/for_profit_report/PartI-PartIII-SelectedAppendixes.pdf.
[7] *Id.* at  125.

72.     Where the prior review said, for example, that Ivy Bridge of Tiffin had "a strong curriculum, efficient and effective academic support, [and] excellent instruction," this one said that the Ivy Bridge of Tiffin courses were of "poor quality" and "lacking in content."

73.     Likewise, Tiffin's once "effective utilization" of alliances like Ivy Bridge turned into a "lack of faculty oversight" and a "failure to demonstrate responsibility" for Ivy Bridge of Tiffin.

74.     This came as quite a shock to Tiffin and Ivy Bridge given that the only meaningful change at Ivy Bridge of Tiffin since the previous positive review from HLC was that Ivy Bridge of Tiffin had invested even *more time and money* into its curriculum.

75.     But the world had changed drastically for HLC because of the political pressure to prove that it was meaningfully regulating non-traditional higher education institutions.

76.     On or about June 26, 2013, a representative of Tiffin had a lengthy discussion with Bob Appleson of HLC, during which Appleson advised that:

   a.   Tiffin should immediately begin planning to dissolve Ivy Bridge of Tiffin;

   b.   Tiffin should not have any future joint academic arrangements with Ivy Bridge; and

   c.   Tiffin could not have any contractual arrangement of any kind with Ivy Bridge after January 1, 2014.

77.     During this conversation, HLC threatened Tiffin with serious consequences if it did not completely sever its ties with Ivy Bridge, including a visit from HLC to determine if "sanctions" were necessary as well as "increased scrutiny" from the Department of Education and the state Board of Regents.

78.     On or about July 19, 2013, Dr. Marion received a call from Appleson, wherein Appleson told him that Tiffin should expect a letter the following week with HLC's directives regarding Ivy Bridge of Tiffin.

79.     HLC's directives were memorialized in a July 24, 2013 letter, in which Manning advised Dr. Marion that Tiffin must terminate its involvement in the Ivy Bridge of Tiffin joint venture no later than September 30, 2013 and must "cease admitting new students into any of the degree programs offered by [Ivy Bridge of Tiffin] and cease its marketing and recruiting efforts related to these entities by July 28, 2013."

80.     The letter advised Tiffin that if the joint venture was not terminated "within thirty days," HLC would place Tiffin's change of control application on its October Board agenda.

81.     The clear implication was that the change of control application Manning had forced Tiffin to submit would be denied, and Tiffin would lose its accreditation.

82.     In short, if Tiffin continued its joint venture with Ivy Bridge, then it faced the prospect of losing its accreditation, which would be a death sentence for the 127-year-old institution.

83.     Faced with the threat of sanctions and loss of accreditation, Tiffin had no choice but to break its agreements with Ivy Bridge and shut down Ivy Bridge of Tiffin.

84.     According to Dr. Marion, HLC "made it clear that we have no choice."

85.     Thus, on October 7, 2013, Tiffin terminated the joint venture with Ivy Bridge.

86.     Specifically, Tiffin terminated the Joint Venture Agreement, the Program Agreement, the Marketing Agreement, the Tiffin IP Agreement, the Altius IP Agreement, and the Cross-License Agreement that governed the relationship.

87. After Tiffin terminated the joint venture, HLC did another review of Tiffin in connection with an "advisory visit," which Tiffin easily passed.

88. The May 2014 report regarding the advisory visit glossed over or entirely ignored concerns about Tiffin's online course content and compliance with federal regulations that HLC previously identified in the May 2013 summary report.

89. Nor did the May 2014 report address HLC's previous accusations that Tiffin impermissibly shared confidential student information and behaved without integrity in its interactions with HLC.

90. Thus, it appears that HLC created the harshly critical May 2013 summary report solely to force Tiffin to sever its relationship with Ivy Bridge.

91. After HLC destroyed Ivy Bridge's joint venture with Tiffin, Ivy Bridge sought to partner with other four-year universities to revive itself, including Concordia University and Ohio Christian University.

92. Each school was willing to start a program similar to Ivy Bridge of Tiffin, but, on information and belief, each was threatened by HLC with sanctions if they did.

93. Had HLC not interfered with Ivy Bridge's relationships, it would have gone on to serve hundreds of thousands of underprivileged students.

94. In the end, HLC's actions destroyed Ivy Bridge by ruining its ability to operate, fundamentally compromising its reputation and preventing it from operating as a going concern.

## FIRST CLAIM FOR RELIEF

### [Intentional Interference With Contractual Relations]

95. Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if fully set forth herein.

96.     Fully enforceable and valid contracts existed between Ivy Bridge, on the one hand, and Tiffin, on the other, which are attached hereto as Exhibits A-E (the "Agreements").

97.     These Agreements were the backbone of the joint venture that became Ivy Bridge of Tiffin.

98.     The contractual relationship was economically beneficial to Ivy Bridge and Tiffin. For example, in 2012 the joint venture earned more than $25 million in revenue.

99.     Defendant was fully aware of and had full knowledge of the Agreements and the joint venture.

100.    Indeed, HLC was notified when the Agreements were initially made, and it was provided copies of the Agreements in connection with its review of Tiffin University.

101.    HLC engaged in wrongful and unjustified acts to interfere with the contractual relationship between Ivy Bridge and Tiffin, including but not limited to

a.  Undertaking a "change of control" review as a pretext to revisit Tiffin's accreditation status despite the absence of any change in control;

b.  Criticizing Tiffin for failing to "formally" report the Ivy Bridge joint venture to HLC, even though HLC acknowledged that it "had no policy that would have related to the establishment of a joint venture" at the time the Agreements were made, and that HLC's "comprehensive evaluation team was aware of the joint venture";

c.  Issuing a report that was unduly critical of Ivy Bridge of Tiffin to provide a false basis upon which HLC could threaten Tiffin's accreditation status;

d.  Threatening to revoke Tiffin's accreditation unless it severed its relationship with Ivy Bridge; and

    e.  Refusing to consider any measures short of completely dismantling Ivy Bridge of Tiffin.

102.    Through its wrongful and unjustified actions described above and incorporated by reference herein, Defendant intended to induce and cause Tiffin to breach the Agreements.

103.    Through its actions described above and incorporated by reference herein, Defendant did cause Tiffin to breach the Agreements. HLC forced Tiffin to terminate its association with Ivy Bridge altogether.

104.    HLC's interference damaged Ivy Bridge by causing it to lose revenue, profits, and enterprise value, among other injuries and damages.

WHEREFORE, Ivy Bridge respectfully requests that judgment be entered in its favor and against Defendants, awarding Ivy Bridge restitution and damages, including but not limited to lost profits and all other damages permitted by law; and awarding such other relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### [Intentional Interference With Prospective Business Interests]

105.    Ivy Bridge realleges and reincorporates each of the preceding paragraphs as if fully set forth herein.

106.    In 2013, Ivy Bridge was negotiating prospective deals with Concordia University and Ohio Christian University to establish public-private partnerships similar to Ivy Bridge of Tiffin.

107.    Both institutions were very interested in and willing to start programs using the Ivy Bridge of Tiffin model, and, thus, Ivy Bridge had a reasonable expectation of entering into valid business relationships with Concordia University and Ohio Christian University.

108. These relationships would have resulted in an economic benefit to Ivy Bridge, including revenue, profits and enterprise value, among other things.

109. HLC knew of and was fully aware of Ivy Bridge's negotiations with Ohio Christian University and Concordia University.

110. HLC engaged in wrongful and unjustified acts with the intent to disrupt and destroy that economic relationship and / or knew that as a result of its actions such disruption was certain or substantially certain to occur.

111. In or around August 2013, HLC advised Ohio Christian University's president that they were not allowed to make any financial arrangement concerning a "teach-out" of Ivy Bridge of Tiffin students.

112. On information and belief, HLC sent a message to both Ohio Christian and Concordia University that they would be punished if they pursued economic relationships with Ivy Bridge.

113. On information and belief, HLC's wrongful and unjustified acts were intended to cause and did cause Ohio Christian University and Concordia University to abandon their pursuit of business relationships with Ivy Bridge.

114. The loss of these relationships with Ohio Christian University and Concordia University harmed Ivy Bridge by causing it to lose revenue, profits, enterprise value, among other injuries and damages.

WHEREFORE, Ivy Bridge respectfully requests that judgment be entered in its favor and against Defendants, awarding Ivy Bridge restitution and damages, including but not limited to lost profits and all other damages permitted by law; and awarding such other relief as the Court deems just and proper.

Dated:  December 30, 2016

Respectfully submitted,

By:   /s/ Patrick M. Collins

Patrick M. Collins (No. 6206686)
Jade R. Lambert (No. 6290000)
Jeremy L. Buxbaum (No. 6296010)
Perkins Coie LLP
131 South Dearborn Street
Suite No. 1700
Chicago, Illinois 60603-5559
Tel:  (312) 324-8400
Fax:  (312) 324-9400
Email:  pcollins@perkinscoie.com

**ATTORNEYS FOR PLAINTIFF
IVY BRIDGE UNIVERSITY, LLC**